**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-2238

———————

SINGER MANAGEMENT CONSULTANTS, INC.;
LIVE GOLD OPERATIONS, INC.,

Appellants.

v.

ANNE MILGRAM,
Attorney General of the State of New Jersey

———————

On Appeal from the United State District Court
for the District of New Jersey
(D. C. No. 2-07-cv-03929)
District Judge:  Honorable Dickinson R. Debevoise

———————

Argued on November 17, 2009

Before:  AMBRO, ALDISERT and ROTH, <u>Circuit Judges</u>

(Opinion filed:  August 5, 2010)

William L. Charron, Esquire **(Argued)**
Pryor Cashman
7 Times Square
New York, NY 10036

          Counsel for Appellants

Anne Milgram, Esquire
Attorney General of the State of New Jersey
Andrea M. Silkowitz, Esquire
Assistant Attorney General
Jeffrey Koziar, Esquire **(Argued)**
Deputy Attorney General
Division of Law
124 Haley Street, 5th Floor
P. O. Box 45029
Newark, NJ 07101

          Counsel for Appellee

---

O P I N I O N

---

**ROTH**, Circuit Judge:

## I. Introduction

This appeal requires us to determine whether Appellant Live Gold Operations, Inc. was a "prevailing party" entitled to

2

recover its reasonable attorney's fees, pursuant to 42 U.S.C. § 1988(b), in view of the relief it obtained in its lawsuit to restrain the Attorney General of the State of New Jersey from her allegedly unconstitutional enforcement of the New Jersey Deceptive Practices in Musical Performances Statute (Truth in Music Act), N.J. Stat. Ann. § 2A:32B-1 to -3. At the TRO hearing, the District Court determined that Live Gold was likely to succeed on the merits of its constitutional claims and issued a temporary restraining order against the State. At the subsequent preliminary injunction hearing, the District Court persuaded the State to adopt Live Gold's interpretation, "bound" the State to its new position, and vacated the then-expired TRO without granting further relief. Later, the Court granted the State's motion to dismiss, concluding that Live Gold's constitutional claims were moot in view of the parties agreement that "[t]he constitutional disagreements in this case were resolved" at the preliminary injunction hearing.

For the reasons that follow, we conclude that the District Court erred in holding that Live Gold was not a prevailing party because it "voluntar[ily]" changed its interpretation of the Truth in Music Act. Accordingly, we will vacate the judgment of the District Court and remand this case for an order awarding reasonable attorney's fees and costs and for the calculation thereof.

## II. **Factual Background and Procedural History**

Live Gold[1] manages and promotes the music recording and performing groups known as "The Platters" and "The Cornell Gunter Coasters," pursuant to licenses of unregistered trademarks by the same names. In August 2007, the State learned that Live Gold had scheduled a two-week concert of the Platters and Coasters groups at the Hilton Hotel in Atlantic City, to begin on August 18. The State contacted Live Gold and informed it that its use of the trademarks "The Platters" and "The Cornell Gunter Coasters" might violate the Truth in Music Act, which provides:

> A person shall not advertise or conduct a live musical performance or production through the use of an affiliation, connection or association between the performing group and the recording group unless:
>
> (a)   The performing group is the authorized registrant and owner of a federal service mark for the group registered in the United States Patent and Trademark Office; or
>
> (b)  At least one member of the performing group was a member of the recording group and has a legal right by virtue of use or operation under the

---

[1]Plaintiff Singer Management was voluntarily dismissed from this case on July 15, 2009.

group name without having abandoned the name or affiliation of the group; or

(c)  The live musical performance or production is identified in all advertising and promotion as a salute or tribute; or

(d)  The advertising does not relate to a live musical performance or production taking place in this State; or

(e)  The performance or production is expressly authorized by the recording group.

N.J. Stat. Ann. § 2A:32B-2.[2]

Live Gold responded by providing the State with evidence of its ownership of common law unregistered trademarks in the groups' names, asserting that the unregistered trademarks should be considered "express authorizations" under

---

[2] The Act defines the term "performing group" as "a vocal or instrumental group seeking to use the name of another group that has previously released a commercial sound recording under that name." N.J. Stat. Ann. § 2A:32B-1. "Recording group" is defined under the Act as "a vocal or instrumental group, at least one of whose members has previously released a commercial sound recording under that group's name and in which the member or members have a legal right by virtue of use or operation under the group name without having abandoned the name or affiliation with the group." *Id.*

5

subsection (e) of the Truth in Music Act. Not satisfied that ownership of an unregistered trademark could comply with the Truth in Music Act, the State advised the Hilton that it could avoid liability under the Truth in Music Act by ticketing and advertising the concert as a "tribute" or "salute" to the Platters and Coasters groups. The Hilton complied.

On August 17, 2007, the day before the first Hilton concert, Live Gold sued the State, seeking a TRO and injunctive relief against its enforcement of the Truth in Music Act. Live Gold argued, *inter alia*, that the State's enforcement of the Truth in Music Act conflicted with the Lanham Act, 15 U.S.C. § 1125, and violated Live Gold's civil rights.

At the TRO hearing, Live Gold explained that it had the right to conduct performances using its unregistered trademarks, and objected that the State's actions caused the Hilton to label their groups inaccurately as "tributes" or "salutes." In response, the State argued that, because Live Gold's unregistered trademarks did not constitute "express authorizations" under the Act, the Hilton concert must be billed as a tribute or salute. The District Court found the State's position to present "a very serious problem," and explained:

> That is not what [Live Gold's groups] want to do. That is not what they say accurately describes them. So, in effect, the State is telling the Hilton to advertise or publicize this event in a way which is not in accordance with the description which these promoters of the events say is accurate.

6

. . .

> I think there is sufficient problem with the State's position so that I – there is a likelihood of success on the merits in this particular case.

. . .

> [T]here may be substantial federal rights being impaired by the action of the State in this case, generally, under the statute . . . important federal rights are at issue, both freedom of speech rights under the Lanham Act and private rights to nonregistered trademark – trade name. Consequently, the Temporary Restraining Order will issue.

That TRO "temporarily restrained and enjoined [the State] from interfering in any way with [the Hilton concert], and the marketing and promotion thereof." The Hilton then resumed advertising and ticket sales without identifying the concert as a tribute.

On September 7, 2007, the parties returned to the District Court for a hearing on the preliminary injunction. In its written submission prior to the hearing, the State argued that an unregistered trademark satisfied the Truth in Music Act only if the performing group obtained express authorization from an original group member, included an original member, or denominated itself as a "tribute" or "salute." The State contended that its interpretation of the Act was consistent with

7

the Lanham Act, the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment. It also objected to Live Gold's suit on jurisdictional grounds.

The District Court began the preliminary injunction hearing by asking the State why it insisted on distinguishing between registered and unregistered trademarks: "Why shouldn't they proceed on an equal basis, two valid trademarks?" In response, the State argued that because the Lanham Act accorded a rebuttable presumption of validity to registered trademarks, the State's discrimination against unregistered trademarks was consistent with federal law. The District Court repeatedly rejected this argument, explaining that the differences under federal law between registered and unregistered trademarks for purposes of validity did not authorize the State to discriminate against an unregistered trademark, once proven valid. "There's no reason for it," the Court declared. Nevertheless, the State continued to press its interpretation of the Truth in Music Act. The District Court again rejected the State's position, stating, "[w]ell, I fail to see it."

After rejecting the State's arguments, the District Court suggested that the State reconcile the Truth in Music Act with the Lanham Act by interpreting subsection (e) to permit unregistered trademark holders to perform under their group names, without any additional requirements. The State capitulated, effectively adopting Live Gold's interpretation of the Act. Incredulous, Live Gold objected that the State had made "a 180 degree shift in position." The Court agreed, telling the State that the position in its brief was "contrary to what I

8

[just] understood you to say." In response, the State explained that its previous position "was inadvertently put into the brief." The Court then declared that the State would be "bound by" its new interpretation of the Act.

Live Gold then moved for summary disposition, contending that it "should win" because the State had "admitt[ed] the allegations" in the complaint. The Court demurred, observing that the State's new position resolved the "basic legal problem, which was an equal protection problem, a First Amendment problem, [and] a due process problem." The Court again took note of the State's "evolved" position, but saw no need to "go any further." The Court then announced:

> We have a statement by the State of New Jersey as to what the meaning of this statute is insofar as it relates to common law trademarks, and I think we've stated it. If there's a valid common law trademark under the Lanham Act, and if whoever has possession of it can establish a right to that possession, he is to be treated – or she is to be treated in the same way as the holder of a registered trademark. Now, no necessity of – to say or give any tribute to anybody. So we have an agreement on that.

The Court then vacated the TRO, which had already expired "by its own term[s] [after] 10 days, and . . . was directed primarily to the August performance at the Hilton." Having secured the State's position going forward, the District Court left open the option of continuing the consideration of the preliminary injunction but found no need to convert the TRO to a preliminary injunction at that time.

9

By letter dated September 25, 2008, Pryor Cashman LLP sought leave to move for an award of its attorney's fees and costs incurred in representing Live Gold. The application was referred to a Magistrate Judge, who converted it to a letter motion. On December 29, 2008, the Magistrate Judge denied Pryor Cashman's application, concluding that Live Gold was not a "prevailing party" under 42 U.S.C. § 1988(b) because the State had voluntarily changed its position on the meaning of the Truth in Music Act.

On January 13, 2009, Plaintiffs appealed the Magistrate Judge's order to the District Court. On January 16, 2009, the State filed a motion to dismiss. The Court addressed both issues in a hearing on March 16, 2009.

At the March 16 hearing, the Court first addressed the State's motion to dismiss. Seeking to identify any unresolved constitutional issues, the District Court asked the State to confirm that "[e]ven though literally, [the Truth in Music Act] might be interpreted to exclude [performing groups holding unregistered trademarks], it doesn't really do so and you're not interpreting it to do so." The State concurred, stating, "[t]he position we took on September 7, 2007, in this courtroom, is the position we're taking now." The Court then obtained the agreement of all parties that the preliminary injunction hearing resolved Live Gold's constitutional claims, and asked "[w]hy shouldn't [Live Gold's complaint] be dismissed, other than [Pryor Cashman's] application for attorney's fees?" After hearing Live Gold's arguments, the Court remained unpersuaded, explaining "I just don't know what else there is to address. . . . In effect, [Live Gold] won the case."

The Court then turned to Pryor Cashman's application for attorney's fees. After hearing from Live Gold, the Court asked, "State, why shouldn't you be responsible for attorney's fees[?]"

10

In response, the State contended that a fee award was inappropriate because "there was no past enforcement action" and because it had never taken *any* position on the Truth in Music Act. The Court disagreed with the latter contention, reminding the State that it made a "180 degree change in position because [it] came in negating everything that [Live Gold] [was] urging, and in effect conceded [Live Gold] [was] right, and permitted everything to go forward." The State again distanced itself from its initial arguments, explaining that they were "not . . . as clear as they could have been" because the State was rushed in responding to the TRO application. The Court took the matter under advisement.

On April 7, 2009, the District Court entered an order affirming the Magistrate's order denying Live Gold's attorney's fees and granting the State's motion to dismiss. In its order, the District Court held that Live Gold was not a prevailing party because the District Court "did not enter a preliminary injunction or any other order on the merits of the case." The District Court also concluded that the State voluntarily changed its position, stating that, "[w]hile it may be true that this court's involvement aided in the resolution of the constitutional issues between the parties, the fact remains that the issues were not resolved as the result of a court order." The Court additionally granted the State's motion to dismiss, concluding that Live Gold's claims were moot in light of the parties' agreement that the preliminary injunction hearing had resolved all of Live Gold's constitutional claims. In this appeal, Live Gold challenges only the District Court's denial of attorney's fees.

## III. **Discussion**

Pursuant to § 1988(b), courts "may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" in civil rights cases. Notwithstanding the permissive language of the

11

statute, this Court has held that a prevailing party "should" recover an award of attorney's fees, absent special circumstances. *Truesdell v. Phila. Hous. Auth.*, 290 F.3d 159, 163 (3d Cir. 2002). We "exercise plenary review over . . . the question of whether [a party] was a 'prevailing party.'" *Id.*

Plaintiffs who "succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit" may be considered "prevailing parties." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (quoting *Nadeau v. Helgemoe*, 581 F.2d 275, 278-79 (1st Cir. 1978)). Although the litigation need not progress to a final judgment on the merits, a party seeking "prevailing party" status must demonstrate a "judicially sanctioned change in the legal relationship of the parties." *Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 605 (2001). A "voluntary change in conduct . . . lacks the necessary judicial *imprimatur* on the change." *Id.* In other words, "a plaintiff does not become a 'prevailing party' solely because his lawsuit causes a voluntary change in the defendant's conduct." *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 232 (3d Cir. 2008). Rather, the change in the parties' legal relationship must be the product of judicial action. *See Buckhannon*, 532 U.S. at 605-06.

The crux of this appeal is whether the change in the legal relationship of the parties was brought about through action of the District Court or through the voluntary conduct of the State. The State argues, and the District Court agreed, that its change in position was voluntary. We conclude that the District Court erred in reaching this determination.

At the TRO hearing, the District Court heard argument with respect to Live Gold's claim that the State was enforcing the Truth in Music Act in violation of its constitutional rights.

12

The District Court saw a "very serious problem" with the State's interpretation of the Act, which required holders of unregistered trademarks to identify their performing groups as "tributes" or "salutes," and noted that the State's position threatened to impair Live Gold's "substantial federal rights." After hearing argument from both sides, the District Court found a likelihood of success on the merits and entered the TRO.

At the subsequent preliminary injunction hearing, the State held fast to its original position that the Truth in Music Act required holders of unregistered trademarks to obtain some form of "express authorization" to perform under their trademarked names. It was not until after the District Court had rejected all of the State's arguments and a preliminary injunction was imminent that the State made an about-face in position, adopted Live Gold's position, and was declared by the Court to be "bound" by it.

In light of these facts, we hold that Live Gold obtained "judicially sanctioned" relief "on the merits" so that it was a prevailing party within the meaning of *Buckhannon*, 532 U.S. at 603, 605. By virtue of the TRO, the State was prohibited from enforcing its interpretation of the Truth in Music Act, and Live Gold's groups were able to perform without having to identify themselves as tribute groups. This alone may have been enough to confer prevailing party status, as the TRO did more than preserve the status quo and arguably afforded Live Gold all the relief it sought. *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1161 (9th Cir. 2000) (plaintiff became a prevailing party by obtaining a TRO that did more than preserve the status quo by allowing the plaintiff's convention and art exhibition to take place); *cf. John T. v. Del. Cnty. Intermediate Unit*, 318 F.3d 545, 558-59 (3d Cir. 2003) (a preliminary injunction to maintain the status quo during the course of IDEA proceedings did not make the plaintiff a prevailing party).

13

Yet the Court's involvement went far beyond its issuance of the TRO. At the preliminary injunction hearing, the State initially persisted in its view that an unregistered trademark was insufficient to satisfy the Truth in Music Act, absent additional authorization.[3] The Court candidly disagreed, repeatedly rejecting the State's argument that the Act could constitutionally distinguish between registered and unregistered trademarks. Against the Court's inimical questioning, and after spending several transcript pages defending its position, the State eventually acquiesced in Live Gold's interpretation of the Act. At the Court's request, the State agreed for the first time that a valid unregistered trademark constituted "express authorization" under subsection (e), without any further requirement. The Court then declared that the State would be "bound" by its new interpretation, which resolved "the basic legal problem." Later, when considering the State's motion to dismiss, the Court commented that Live Gold "[i]n effect, . . . won the case," as a result of the events at the preliminary injunction hearing.

Here, Live Gold did not obtain relief solely because it filed a lawsuit, *Buckhannon*, 532 U.S. at 605, 610, nor because the District Court entered a TRO that merely preserved the status quo, *see John T.*, 318 F.3d at 558-59. In our view, the Court effected a "judicially sanctioned change in the legal relationship of the parties," *Buckhannon*, 532 U.S. at 605, by entering the TRO, and later rejecting the State's position on the

---

[3] The State's representation that it never "engaged in any enforcement action or even offered an interpretation of the Truth in Music Act when [Live Gold] filed suit," is misleading in light of its acknowledgment at oral argument that it expressly advised the Hilton that "to avoid any problems . . . [it] can bill this concert as a tribute." Recording of Oral Argument at 21:25-22:16.

14

merits, persuading the State to abandon that position, and declaring that the State was "bound" by its new interpretation of the Act. The Court's active involvement impelled the State to make, in the Court's words, a "180 degree change in position because [it] came in negating everything that [Live Gold was] urging, and in effect conceded they were right." In our view, the State's change in position was a direct "result[] of the legal process," *People Against Police Violence*, 520 F.3d at 234, wherein the District Court examined both parties' arguments and placed its "judicial *imprimatur*" on Live Gold's interpretation of the Act, *Buckhannon*, 532 U.S. at 605. *See also Palmetto Props., Inc. v. Cnty. of Dupage*, 375 F.3d 542, 550 (7th Cir. 2004) (where the defendant county repealed an ordinance "only *after* . . . and presumably *because of*" the district court's determination that the ordinance was unconstitutional, that repeal was "involuntary – indeed exhibiting judicial imprimatur"). Based on these circumstances, we must reject the District Court's conclusion that the State's change of heart was "voluntary."

We also reject the District Court's conclusion that Live Gold obtained no relief "on the merits." The District Court issued the TRO after determining that Live Gold had a likelihood of success on its underlying constitutional claims. Live Gold's success was all but assured when the District Court rejected the State's interpretation of the Truth in Music Act as inconsistent with federal law. Only then did the State change its position, mooting Live Gold's claim for a preliminary injunction by agreeing for the first time that an unregistered trademark could satisfy the Act. Given this sequence of events, we must reject the District Court's conclusion that Live Gold is not a prevailing party simply because a preliminary injunction never issued. *See People Against Police Violence*, 520 F.3d at 234 ("The fact that plaintiffs achieved their success by litigating and enforcing a preliminary injunction rather than by proceeding to

15

final judgment on the merits does not diminish the substance of their litigated victories."); *Palmetto*, 375 F.3d at 549-50 ("It would defy reason and contradict the definition of 'prevailing party' under *Buckhannon* . . . to hold that simply because the district court abstained from entering a final order . . . [plaintiff] somehow did not obtain a 'judicially sanctioned change.'"); *Walker v. City of Mesquite, Tex.*, 313 F.3d 246, 250 (5th Cir. 2002) (plaintiffs received "judicial relief" entitling them to prevailing party status because, "[a]lthough the permanent injunction sought by the [plaintiffs] was never granted," the appellate court ruled "as a matter of law, that the remedial order was unconstitutional for precisely the reasons argued by the [plaintiffs]"). Although Live Gold did not obtain a preliminary injunction, it undeniably "receive[d] at least some relief on the merits," *Buckhannon*, 532 U.S. at 603, when the District Court sustained its interpretation of the Act and "bound" the State to that interpretation. To conclude otherwise would profoundly elevate form over substance.

Finally, we observe that, as a practical matter, the State's unilateral actions mooted Live Gold's claims just when it appeared that the District Court would enter an order in Live Gold's favor. However, even without such an order, in view of the concession that the District Court finally obtained from the State on its interpretation of the Truth in Music Act, we find it very clear that in the future the State will not treat holders of unregistered trade marks differently than it treats holders of registered trademarks. Thus, even without the order, the court's actions memorialized on the record the interpretation that the State will give to the Act – the complete relief that Live Gold sought. On these facts, we deem the State's belated change of position insufficient to prevent an award of prevailing party attorney's fees to Live Gold.

16

## IV. Conclusion

For the reasons stated above, we conclude that *Buckhannon* permits us to award § 1988(b) attorney's fees under the circumstances of this case. Accordingly, we will vacate the order of the District Court and remand for entry of an order awarding fees and costs to Pryor Cashman and for the calculation of these fees and costs in a reasonable amount.

17

AMBRO, <u>Circuit Judge</u>, dissenting

The issue in this case is whether a party has "prevailed" within the meaning of 42 U.S.C. § 1988 if that party obtains a temporary restraining order the day after it files suit (after a hearing but before briefing from the opposing side), but 22 days later is denied a preliminary injunction because the opposing party's voluntary change of position moots the case. My colleagues say yes. Because I believe that Supreme Court precedent requires us to answer no, I respectfully dissent.[1]

I.      **Governing Precedent**

To be eligible to make a prevailing-party claim under § 1988, the plaintiff must, "at a minimum, . . . be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989).[2] The Supreme Court so far has identified two such

---

[1] However, my heart is with the majority. Were the attorneys' fees determination based solely on equitable considerations, I would readily conclude that Live Gold was a "prevailing party."

[2] Of course, the resolution must "achieve[] some of the benefit the part[y] sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (internal quotation marks and citation omitted).

resolutions: (1) judgments on the merits, and (2) court-ordered consent decrees (including settlement agreements enforced through consent decrees). *Buckhannon Bd. & Care Home, Inc. v. W.V. Dep't of Health & Human Res.*, 532 U.S. 598, 604 (2001).

The first resolution contains two independent requirements: (1) a judgment (2) that was on the merits.[3]

## A.    The Judgment Requirement

A grant of summary judgment or a trial verdict in favor of the plaintiff is no doubt a "judgment." In contrast, a court's "judicial pronouncement that the defendant has violated the Constitution" does not create the requisite "material alteration of the legal relationship between the parties . . . until the plaintiff becomes entitled to enforce a judgment." *Farrar v. Hobby*, 506 U.S. 103, 112–13 (1992).

Thus, when an appellate court, in reversing the district court's dismissal of the plaintiff's claim, ruled that the plaintiff's constitutional rights were violated, the Supreme Court held that the plaintiff had not "prevailed" because there was no enforceable judgment. *Hewitt v. Helms*, 482 U.S. 755, 760

---

[3] Live Gold does not argue that the second resolution, "court-ordered consent decree," is in play here, nor could it, for the reasons discussed below. *See infra* note 8.

2

(1987).  The only "relief" to the plaintiff from this appellate victory was "the moral satisfaction of knowing that a federal court concluded that his rights had been violated."  *Id.* at 762.

**B.      The Merits Requirement**

Any judgment must also be "on the merits."  As recognized by the Supreme Court shortly after § 1988 was amended to allow attorney's fees, "Congress intended to permit the interim award of counsel fees *only* when a party has prevailed *on the merits* of at least some of his claims." *Hanrahan v. Hampton*, 446 U.S. 754, 758 (1980) (*per curiam*) (emphases added); *see also id.* at 757 ("[I]t seems clearly to have been the intent of Congress to permit such an interlocutory award only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal.").  Similarly, the Supreme Court has observed that "[r]espect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to prevail." *Hewitt*, 482 U.S. at 760 (citing *Hanrahan*, 446 U.S. at 757).

Indeed, in an area of the law that "has been framed in various ways," *Hensley*, 461 U.S. at 433, the merits-based requirement established in *Hanrahan* and *Hewitt* has been consistently repeated throughout the Court's "prevailing party" jurisprudence. *See Sole v. Wyner*, 551 U.S. 74, 82 (2007); *Buckhannon*, 532 U.S. at 603–04, 608; *Farrar*, 506 U.S. at

3

110–12; *Garland*, 489 U.S. at 790, 792. We thus have followed suit to hold that, to be entitled to prevailing party fees based on interim relief, relief must be "derived from some determination on the merits." *J.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 274 (3d Cir. 2002).

## II. Live Gold did not receive a "judgment on the merits," and therefore was not a prevailing party

### A. The temporary restraining order was not issued on the merits

In this case, we have one judgment—a temporary restraining order. In *People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226 (3d Cir. 2008) ("*PAPV*"), we held that injunctive relief "can, under appropriate circumstances, render a party 'prevailing.'" *Id.* at 233.

However, the "merits" requirement is difficult to meet in the context of TROs and injunctions, as the plaintiff needs only to show a *likelihood* of success on the merits to be granted relief. Because of this, we have held that a court's finding of "reasonable probability of success on the merits" is not a resolution of "any merit-based issue." *John T. v. Del. County*, 318 F.3d 545, 559 (3d Cir. 2003) (internal quotation marks and citation omitted). As this "probability" ruling is usually the only merits-related legal determination made when courts grant

4

TROs and preliminary injunctions, it follows that parties will not often "prevail" based solely on those judgments.

Our decision in *PAPV* provides an example of that rare situation where a merits-based determination is made at the injunction stage. There, a rally organizer challenged the constitutionality of an ordinance that required groups to prepay police protection costs before they could receive a permit for parades and rallies. *PAPV*, 520 F.3d at 229. At the first hearing in the case, the District Court granted the requested TRO after "concluding that [the ordinance] 'was facially unconstitutional,'" and that, even if the City voluntarily did not enforce the ordinance (as it had offered to do), "a permit regime devoid of any prescribed process would also be unconstitutional." *Id.* Therefore, the Court enjoined the City from enforcing the law, imposed its own temporary procedures governing permits, and directed the parties to meet and confer concerning a new proposal. *Id.* at 229–30. The City later proposed a revised ordinance, but the Court found it problematic, converted the TRO to a preliminary injunction, and requested further briefing. *Id.* at 230.

The City submitted a second revised ordinance, and in the meantime formally repealed the unconstitutional provision. *Id.* After this repeal, the City moved to dismiss the suit. *Id.* The Court denied the motion because no new procedures had taken the now-repealed ordinance's place, and a lack of guidelines was itself unconstitutional. *Id.* The injunction remained in

5

effect for over two years until a new ordinance that satisfied the plaintiffs' concerns was enacted. *Id.* Only at that point did the Court lift the injunction and close the case with the parties' agreement. *Id.*

As this summary makes clear, the legal victories in *PAPV* are far from the events in the current case. The District Court here never ruled, as did the *PAPV* Court, that the challenged law (or application of the law) was unconstitutional. *Id.* at 234. Instead, the TRO was based only on a "likelihood of success on the merits."[4]  App. 187.  In *PAPV*, the TRO prohibited enforcement of the challenged ordinance and affirmatively created new procedures to govern the city in the meantime. The TRO in our case merely enjoined the State of New Jersey "from interfering in any way with live performances by Plaintiffs' respective groups at the Hilton Hotel in Atlantic City, New

---

[4] While the Court suggested at the TRO hearing that the State's interpretation of the law posed "a very serious problem," App. 186, and recognized "a significant risk there may be substantial federal rights being impaired by the action of the State," App. 187, that will be true in almost all of these cases—§ 1988 deals with civil rights cases, which invariably involve "very serious" and "substantial federal rights." The Court merely acknowledged that "the State *maybe* has some merit to its position," and stated it could resolve the merits "at a later date upon the return day of the Order to Show Cause." App. 187 (emphasis added).

Jersey, and the marketing and promotion thereof." App. 190.[5] The State remained free to enforce the Truth in Music Act (so long as it did not interfere with the Hilton performances).

Therefore, the TRO here was not merits-based. As such, it does not confer eligibility for prevailing party status. We must determine if anything occurred after the TRO to resolve the controversy on the merits and render Live Gold the prevailing party under § 1988.

### B. The State's actions after the TRO issued were voluntary, and no judgment was issued

There was no judgment in this case (except the TRO) because the State mooted the case at the preliminary injunction hearing by agreeing with Live Gold's position. As noted, the Supreme Court has identified two formal resolutions that make a winning attorney eligible for a fee award: (1) enforceable judgments on the merits, and (2) court-ordered consent decrees. *Buckhannon,* 532 U.S. at 604. *Buckhannon* characterized these

---

[5] The majority states that, after the TRO was entered, the Hilton "resumed advertising and ticket sales without identifying the concert as a tribute." Maj. Op. at 7. According to the record, this is incorrect. While the groups were introduced by their proper names at the concert, the Hilton did not resume advertising (despite the TRO's protection), and the tickets identified the groups as "tribute" groups. App. 265, 280.

two resolutions as "examples" of decisions that create the necessary material alteration of the legal relationship of the parties. *Id.* at 604–05. Thus, there may be resolutions other than the two identified in *Buckhannon* that warrant prevailing party status (although the Supreme Court has yet to identify any). But even if they are merely examples, *Buckhannon* precludes the events in this case from qualifying as a third form of resolution that can support prevailing party status.

> 1. Under *Buckhannon*, the State's voluntary change of position does not make Live Gold a prevailing party

Some background is useful to understand the sea change caused by *Buckhannon* in this area of the law. Prior to that decision, the rule in most circuits was that a plaintiff was a "prevailing party" if it "achieve[d] the desired result because the

lawsuit brought about a voluntary change in the defendant's conduct." *Id.* at 601–02. This became known as the "catalyst theory." *Id.*

For example, we held pre-*Buckhannon* that a plaintiff who could "prove that the existence of the lawsuit accomplished the original objectives of the lawsuit without a formal judgment c[ould] be a 'prevailing party.'" *Baumgartner v. Harrisburg Hous. Auth.*, 21 F.3d 541, 544 (3d Cir. 1994), *overruled by Buckhannon*, 532 U.S. at 602–05. We applied the "well-

8

established" catalyst theory to allow attorney's fees when defendants "voluntarily changed their behavior to eliminate the complained-of conduct." *Id.* at 544–45. To support this theory, we relied in part on the policy consideration that "if defendants could deprive plaintiffs of attorney's fees by unilaterally mooting the underlying case by conceding to plaintiffs' demands, attorneys might be more hesitant about bringing these civil rights suits, a result inconsistent with Congress' intent in enacting section 1988." *Id.* at 548. Thus, we held that plaintiffs could be prevailing parties "notwithstanding the absence of a judgment or consent decree" so long as they "accomplished the original objectives of the lawsuit." *Id.* at 544, 551.

Were this the law governing us today, I would join my colleagues, as Live Gold accomplished its objectives by filing a lawsuit that catalyzed the State to change its position voluntarily. That there was no judgment or consent decree did not matter under *Baumgarter*, and because the "existence of the lawsuit accomplished the original objectives of the lawsuit," attorney's fees would be warranted. *Id.* at 544.

But *Buckhannon* overruled *Baumgartner*, and the latter is no longer the law. In *Buckhannon*, the Supreme Court reiterated that theretofore it had "only awarded attorney's fees" when the plaintiff obtained a "judgment on the merits" or a "court-ordered consent decree." 532 U.S. at 605. It had *not* awarded attorney's fees under the following circumstances: where the plaintiff acquired a "judicial pronouncement that the

9

defendant has violated the Constitution unaccompanied by '*judicial* relief,'" *id.* at 606 (*quoting Hewitt*, 482 U.S. at 760) (emphasis in original); where the plaintiff "secured the reversal of a directed verdict," *id.* at 605–06 (*citing Hanrahan*, 446 U.S. at 759); or where there was a "nonjudicial alteration of actual circumstances," *id.* at 606 (internal quotation marks and citation omitted). The "catalyst theory" was added to this list, as there is no "judicially sanctioned change" in the parties' "legal relationship." *Id.* at 605. "A defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.*

In so holding, the Court considered the same policy argument we raised in *Baumgartner*—that without the catalyst theory "defendants [could] unilaterally moot[] an action before judgment in an effort to avoid an award of attorney's fees"—but was not swayed. *Buckhannon*, 532 U.S. at 608–09. Thus, however persuasive that argument may seem, it cannot influence our decision here.

To repeat, Live Gold obtained no "judgment" other than the initial TRO, which was plainly not "on the merits." At the preliminary injunction hearing, the State faced a highly skeptical District Court. Partway through that hearing, the State chose to agree with the position pressed by the plaintiff (and, it appears, favored by the District Court). As that agreement resolved the constitutional issues, the case was mooted. Even if there are

10

circumstances where a "judgment on the merits" or a "court-ordered consent decree" is not required for prevailing-party status, *Buckhannon* prevents the events in this case from qualifying. Were I writing for the majority, my analysis would stop here.

### 2. The Majority's Attempt to Circumvent *Buckhannon*

My colleagues recognize that "the State's unilateral actions mooted Live Gold's claims." Maj. Op. at 16. This should end the analysis: *Buckhannon* holds that if the plaintiff "achieves the desired result because the lawsuit brought about a voluntary change in the defendant's conduct," it does not "prevail." 532 U.S. at 601. To hold that Live Gold prevailed because the State changed its legal position, my colleagues resurrect the "catalyst theory" that was laid to rest in *Buckhannon*. In an attempt to disguise the true nature of its analysis, they point to three ways in which Live Gold received "relief on the merits": the District Court (1) "rejected" the State's arguments, Maj. Op. at 8, 13, 14, 15; (2) "persuaded" the State to change its position, *id.* at 3, 15; and (3) "declar[ed]" the State "bound" by its new position, *id.* at 3, 9, 13, 14, 15, 16. These three observations, even if one accepts the guesswork required to make the first two, do not overcome the fact that the State changed its position without a court order (in other words, "voluntar[il]y change[d] [its] conduct," *Buckhannon*, 532 U.S. at 605), and no enforceable judgment was issued on the merits.

11

Turning to the first of these observations, a court's statements during a motions hearing cannot turn into a "judicially sanctioned change" if no order or enforceable judgment results. The District Court's rejection of the State's argument during the preliminary injunction hearing (whatever "rejection" in this context means[6]) is not "judicial relief." If it were, enforceable rulings could result from mere banter between a judge and a litigant during a court hearing. Judges would need to be careful with their words and questions during oral argument, as playing devil's advocate with one side (even if the judge agrees with that side) could turn into an award of attorney's fees for the other. Does whether a party "prevails" turn on how "hot" the bench is, or how definitively the court indicates its inclinations? The absurd results that would arise if a judge's comments during oral arguments constituted enforceable "judicial relief" exemplify the rationale for requiring courts to make actual rulings.

Second, the majority relies on the District Court's persuasion of the State during oral argument to change its position. But even if the State's change were court-encouraged or court-prompted, it was not court-ordered. As the District Court put it in denying attorney's fees to Live Gold, "[w]hile it may be true that [its] involvement aided in the resolution of the

---

[6] To state that the District Court "rejected" the State's position implies the Court did something other than express its doubts about the legality of that position. It did not.

12

constitutional issues between the parties, the fact remains that the issues were not resolved as the result of a court order." App. 14. That the change came after intense questioning by the District Court does not overcome that the State altered its position without a court order. In other words, no matter the *motivation* for the State's change in position, it remains that the State *voluntarily* changed its position.

To repeat, under *Buckhannon* voluntary conduct by the defendant cannot support an award of attorney's fees. There is no exception for voluntary conduct that results from judicial pressure. The majority today creates this apparent exception to *Buckhannon* with no support in Supreme Court precedent or our own precedent.[7]

--------

[7] The majority's analysis has no logical conclusion. Suppose the District Court had remained silent during the preliminary injunction hearing, but the State changed its position because it had researched the District Court's prior opinions and anticipated the way the Court would rule. Would that change warrant attorney's fees? Or suppose the District Court announces at the beginning of the hearing its tentative views, subject to the argument at the hearing. If the State immediately accepts that the District Court's tentative views are correct, without questioning or prodding by that Court, would this change satisfy the majority's test?

Our decision in *PAPV* is instructive in this context. The City of Pittsburgh did not *voluntarily* pass the new ordinance that ended the case. *PAPV*, 520 F.3d at 233. Instead, the City enacted a new ordinance because it was *ordered* to do so by the Court in the preliminary injunction. *Id.* at 233–34 ("It was precisely because the Court believed voluntary change was not to be expected that it ordered the City not to engage in the practices of which plaintiffs complained. There was nothing voluntary about the City's giving up those practices. . . . The District Court . . . directed the City to submit its proposed revis[ed ordinance] to the Court and to confer with plaintiffs regarding the constitutionality of its proposal."). If the City had not been required by a court order to pass a new ordinance, but had instead passed it voluntarily, allowing attorney's fees would have violated *Buckhannon*. Indeed, such was the case in *Buckhannon*: the state legislature voluntarily enacted two bills that mooted the plaintiffs' suit, and the Supreme Court held that the plaintiff had not "prevailed" under those circumstances. 532 U.S. at 601.

As applied here, had the State of New Jersey changed its interpretation of the Truth in Music Act pursuant to an order that its current interpretation was unconstitutional, this case would be governed by *PAPV*, and attorney's fees would be warranted. But the State was not required to change its view, or ordered to do so by the Court. It changed its interpretation of the statute in the middle of a legal debate at a motions hearing. Whereas the success in *PAPV* was "a result of plaintiffs' efforts and court-

14

enforced victories rather than defendant's voluntary actions," 520 F.3d at 236, the plaintiff's success in this case was a result of the State's voluntary decision to change its legal position. Under *Buckhannon*, this success does not render the plaintiff a prevailing party.

Finally, my colleagues find great meaning in the Court's statement that the State was "bound" to the new interpretation, which "memorialized on the record" the State's new position. *See* Maj. Op. at 3, 9, 13, 14, 15, 16. Their reliance falls short for two reasons.

First, this was merely a "judicial pronouncement . . . unaccompanied by judicial relief." *Buckhannon*, 532 U.S. at 606 (internal quotation marks and citation omitted). Following the hearing, the Court issued no order or other judicial relief requiring the State to maintain this position. "[T]he fact is that [Live Gold]'s counsel never took the steps necessary to have a declaratory judgment . . . properly entered. Consequently, [Live Gold] received no judicial relief." *Hewitt*, 482 U.S. at 760.

Second (and even more fundamentally), the State was not actually "bound" to its new interpretation by any court order. The State could have gone back on its word without violating any order or being in contempt of court. For example, assume that, after the preliminary injunction hearing, the State reverted to its initial interpretation of the Act. Could Live Gold have

15

argued that the State was in violation of a court order, such as an injunction or a declaratory judgment? Of course not.[8]

---

[8] For this reason, the State's actions at the preliminary injunction hearing cannot be analogized to a "court-ordered consent decree." Consent decrees can support a fee award because they require "judicial approval and oversight," and there is "federal jurisdiction to enforce" them. *Buckhannon*, 532 U.S. at 604 n.7; *see also Aronov v. Napolitano*, 562 F.3d 84, 91 (1st Cir. 2009) (*en banc*) ("[A]n obligation to comply and the provision of judicial oversight to enforce that obligation are the sine qua non for a consent decree."); *Smyth v. Rivero*, 282 F.3d 268, 280–81 (4th Cir. 2002) ("The parties to a consent decree expect and achieve a continuing basis of jurisdiction to enforce the terms of the resolution of their case in the court entering the order."). They "contemplate[] a court's continuing involvement in a matter" and "may ultimately be enforceable by contempt." *Aronov*, 562 F.3d at 91–92; *see also Truesdell v. Philadelphia Hous. Auth.*, 290 F.3d 159, 165 (3d Cir. 2002) (holding that a court order that "gave [the plaintiff] the right to request judicial enforcement of the settlement" rendered the plaintiff a "prevailing party").

While there may be functional equivalents of consent decrees that can support an award of attorney's fees (for example, when "a settlement agreement is embodied in a court order such that the obligation to comply with its terms is court-ordered," *Smyth*, 282 F.3d at 281; *see also Truesdell*, 290 F.3d at 165), this is not such a case. Here, unlike with a consent decree, the State's agreement in this case to maintain a certain legal position was not made part of any court order. Therefore,

16

However, Live Gold would not be without recourse. The District Court's statement that the State was now "bound" was merely a recognition of the rule of judicial estoppel, also known as the "doctrine against the assertion of inconsistent positions." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). This rule, designed to prevent parties from "playing fast and loose with the courts," "seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding." *Id.* (internal quotation marks and citation omitted); *see also New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). Therefore, Live Gold could argue that the State, based on the interpretation it gave during the preliminary injunction hearing (which the District Court relied upon in declining to enter an injunction), was judicially estopped from reverting to its initial

_____

it was not enforceable and did not change the legal relationship between the parties. Rather than provide "judicial relief," the Court merely made a "judicial observation" that the State had changed its position. *See Buckhannon*, 532 U.S. at 606 (a "judicial pronouncement" without judicial relief cannot support a fee award). And while "consent" may sound a lot like "voluntary," the key to a consent decree is the *decree*—an enforceable order. To conclude that the State's voluntary change in position amounts to a "consent decree" would overrule *Buckhannon*'s holding that a "defendant's voluntary change in conduct, although perhaps accomplishing what the plaintiff sought to achieve by the lawsuit, lacks the necessary judicial *imprimatur* on the change." *Id.* at 605.

17

interpretation. *See G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (noting that judicial estoppel can apply if the party asserting a new position previously "convince[ed] the District Court to accept its earlier position").

My point is this: the District Court's observation that the State was "bound" by its new interpretation of the Truth in Music Act was, at most, an oral acknowledgment that judicial estoppel could preclude it from changing its position again. Put another way, the State's voluntary statements at the injunction hearing bound it, not the Judge's statements. Without a court order requiring the State to maintain that interpretation, the "legal" relationship between the parties has not changed.

3. The Majority's Mode of Analysis Was Rejected by *Buckhannon*

The Supreme Court, as it noted in *Buckhannon*, has consistently "avoided an interpretation of the fee-shifting statutes that would have spawned a second litigation of significant dimension." 532 U.S. at 609 (internal quotation marks, citation, and brackets omitted). One of the problems with the "catalyst theory" was that it "would require analysis of the defendant's subjective motivations in changing its conduct." *Id.* Courts would need to engage in a "highly factbound inquiry" that "may turn on reasonable inferences from the nature and timing of the defendant's change in conduct." *Id.* (internal quotation marks and citation omitted). This was not a "formula

18

for ready administrability," and violated the principle that a "request for attorney's fees should not result in a second major litigation." *Id.* at 609–10 (internal quotation marks and citations omitted).

The analysis by my colleagues today does exactly that: they analyze "the defendant's subjective motivations in changing its conduct." *Id.* at 609. They conclude that the State was "persuad[ed]" and "impelled" by the District Court to change its position. Maj. Op. at 3, 15. As the State itself has never revealed its subjective motivations, my colleagues must rely on "reasonable inferences from the nature and timing of the defendant's change in conduct" to reach these conclusions—precisely the mode of analysis *Buckhannon* rejected. *Buckhannon*, 532 U.S. at 609.

Speculation is required not only as to the State's intentions and motives, but also as to the District Court's. The majority posits that success for Live Gold was "all but assured" before the State's change in position, and that a preliminary injunction was "imminent." Maj. Op. at 13, 15. Other than making "reasonable inferences" from the hearing transcript, there is no way to determine that these were indeed the Court's intentions.[9]

_____

[9] Judge Debevoise, in denying attorney's fees, made no indication a preliminary injunction was imminent at that hearing. He simply stated that the "basic legal problems" in the case were

19

Under the majority's analysis, then, courts will need to divine the defendant's subjective reasons for altering its behavior and the trial court's subjective intentions. While the Supreme Court has been careful to "avoid[] an interpretation of the fee-shifting statutes" that would "result in a second major litigation," the inquiry required by the majority results in exactly that. *Buckhannon*, 532 U.S. at 609 (internal quotation marks and citation omitted).

In sum, to conclude that the State changed its position because the District Court pressured it to do so "would require analysis of the defendant's subjective motives in changing its conduct"—the very analysis the Supreme Court held impermissible in *Buckhannon*. *Id.* To be sure, Live Gold "achieve[d], by instituting litigation, the practical relief sought in [its] complaint." *Id.* at 634 (Ginsburg, J., dissenting). But an analysis that focuses on the "practical impact of the lawsuit,"—as urged by the *Buckhannon* dissent, *id.* at 641 (Ginsburg, J., dissenting)—was rejected by the *Buckhannon* majority, and is not the governing law. Even if I could say for certain the State voluntarily changed its position because it knew the District Court was about to rule against it, that subjective reason cannot render the State's decision to do so involuntary.

---

resolved by "the State's agreement" with Live Gold's legal position, and that he had not "enter[ed] a preliminary injunction or any other order on the merits of the case." App. 9, 13.

20

Live Gold thus cannot be considered a "prevailing party" in this case.

* * * * *

Because no enforceable judgment on the merits was issued in this case, and the State's actions that mooted the case were voluntary, I believe *Buckhannon* tells us that Live Gold was not a prevailing party. Given that precedent, I respectfully dissent.